## Brendan Sherman

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JFS HOLDINGS, INC.,            )
                              )
        Plaintiff,             )
                              )
v.                            )    Civil Action No.
                              )    05-709 SLR
ABESSINIO PROPERTY MANAGEMENT, )
INC.,                          )
                              )
        Defendant.             )

        Deposition of BRENDAN SHERMAN taken pursuant to
notice before Renee A. Meyers, Registered Professional
Reporter and Notary Public, in the law offices of The
Matlusky Firm, LLC, 1423 North Harrison Street,
Wilmington, Delaware, on Tuesday, May 30, 2006, beginning
at approximately 10:42 a.m., there being present:

APPEARANCES:

        THE MATLUSKY FIRM, LLC
        DAVID E. MATLUSKY, ESQ.
        TARA M. DIROCCO, ESQ.
          1423 North Harrison Street
          Wilmington, Delaware  19806
          for Defendant

                CORBETT & WILCOX
            Registered Professional Reporters
        1400 French Street      Wilmington, DE 19801
                (302) 571-0510
            www.corbettreporting.com

Corbett & Wilcox

Brendan Sherman

2 (Pages 2 to 5)

Page 2

1          BRENDAN SHERMAN,
2      the witness herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5 BY MR. MATLUSKY:
6     Q.  Mr. Sherman, I am David Matlusky.  I am the
7 attorney for Abessinio Property Management and
8 Dr. Abbesinio.  This is Tara Dirocco.  She is an
9 associate in the office.
10          Prior to getting into the actual
11 deposition, asking you questions, a few housekeeping
12 matters.  I am just going to go through a litany of
13 reminders.  I am going to ask you a few questions to find
14 out what you know about the facts.  If you do not hear a
15 question, say so and I will repeat it.  If you do not
16 understand a question, say so and I will rephrase it.  If
17 you realize that an earlier answer was incomplete or
18 incorrect, just stop me and we will supplement the answer
19 and correct it.  If you need to stop to use the rest room
20 or get a soda or a drink, just let me know and you are
21 permitted to do so.
22          If you do not know or remember
23 information, just say so.  If you answer a question, I
24 will assume that you have heard it, understood it, and

Page 3

1 have given the answer to the best of your recollection.
2 A reminder to answer all questions verbally, not to use
3 any hand motions or a nod of the head since we do have
4 the stenographer that is listening to answers as opposed
5 to watching for them.
6          Are you on any medication that may
7 affect your recollection or decisions today?
8     A.  No.
9     Q.  That's it.  We can begin.
10          For the record, can you state your name?
11     A.  Brendan Sherman.
12     Q.  And how are you involved in this particular
13 lawsuit?
14     A.  I am the president of JFS Holdings, which is
15 the plaintiff that filed the suit.
16     Q.  And are you acting as JFS Holdings counsel or
17 attorney in this matter?
18     A.  Correct, I am.
19     Q.  For the record, I would also like to clarify
20 that local counsel that's been retained on behalf of JFS
21 Holdings, Inc., is the law firm of Bifferato, Biden,
22 Gentilotti --
23     A.  That's good enough.
24          MS. DIROCCO:  Bifferato, Gentilotti,

Page 4

1 Biden & Balick.
2 BY MR. MATLUSKY:
3     Q.  And Balick.
4          Do you acknowledge, at this point, you
5 are waiving the presence of local counsel?
6     A.  Yes.
7     Q.  And you desire to proceed with the deposition?
8     A.  That's correct.  Yes.
9     Q.  The underlying business was a Laundromat; is
10 that correct?
11     A.  That is correct.
12     Q.  And it was for sale?
13     A.  Yes.
14     Q.  How did you advertise the business for sale?
15     A.  The business was put up with a brokerage
16 company called the Ellsher Group.  They advertise on a
17 website looking for buyers, describing the assets, and
18 waiting for buyers to contact the Ellsher Group.
19     Q.  Who, exactly, is the Ellsher Group?
20     A.  The Ellsher Group is a company that I founded
21 approximately three years ago.  It's a business brokerage
22 firm specializing in the sale of Laundromats.
23     Q.  Now, you say you founded that about three
24 years ago?

Page 5

1     A.  That's correct.
2     Q.  Are you the owner of the business?
3     A.  It's a corporation.  It's a Pennsylvania S
4 Corporation.  I am an officer and a shareholder.
5     Q.  Are you the sole shareholder of that entity?
6     A.  Yes.
7     Q.  And it is a Pennsylvania corporation?
8     A.  Yes.
9     Q.  JFS Holdings, Inc., are they the owners of the
10 Laundromat?
11     A.  That's correct.
12     Q.  And is JFS Holdings, Inc., is a Pennsylvania
13 corporation?
14     A.  That's correct.
15     Q.  And are you the sole shareholder of that?
16     A.  No.  My wife and I own the shares in that
17 entity as tenants by the entireties.
18     Q.  And who manages that particular entity?
19     A.  I do.
20     Q.  Do you run the day-to-day operation?
21     A.  No.  We have, as of right now, we have -- JFS
22 employs three people who run the day-to-day operations.
23     Q.  Where are they employed out of?  What state?
24     A.  They are employed at the stores in Delaware.

Brendan Sherman

3 (Pages 6 to 9)

Page 6

1    Q.  All the stores are in Delaware?
2    A.  Those two stores, yes.
3    Q.  So, JFS Holdings, Inc., is made up of you and
4    your spouse; it's a Pennsylvania corporation; is that
5    correct?
6    A.  That's correct.
7    Q.  And their underlying assets are Laundromats?
8    A.  That's correct.
9    Q.  Do they have any other assets?
10   A.  No.
11   Q.  Do they manage any other assets?
12   A.  No, JFS Holdings has two Laundromats, it's
13   sole assets. One is at 1952 Maryland Avenue in
14   Wilmington, Delaware. The second, obviously, is the
15   Basin Plaza Shopping Center, which is the subject of the
16   complaint.
17   Q.  The subject of the complaint is the Asset
18   Purchase Agreement; is that correct?
19   A.  That's the basis, yes.
20   Q.  Who prepared that Asset Purchase Agreement?
21   A.  I did.
22   Q.  The subject matter is selling the Laundromat
23   to an individual?
24   A.  That's not correct, sir.

Page 7

1    Q.  Please correct me.
2    A.  It's being sold -- it was to be sold to, I
3    believe, Summer State, LLC.
4    Q.  And who was the underlying principal of Summer
5    State, LLC?
6    A.  I believe the principal's name was Roseann
7    Sestito.
8    Q.  And when did you anticipate selling the
9    business to Summer State, LLC?
10   A.  September 1st, '05.
11   Q.  Prior to that, do you know if Summer State,
12   LLC was a valid LLC?
13   A.  I know nothing about Summer State, LLC. I
14   don't know when it was formed. I believe that
15   Miss Sestito was the sole shareholder, at least that's
16   what she represented.
17   Q.  So, as far as entering into an Asset Purchase
18   Agreement, did you do any due diligence to determine if
19   it was a valid LLC formed in the state of Delaware?
20   A.  No, I couldn't care less. As long as she
21   wanted to put the business in the name of Summer State,
22   LLC and came to closing with the funds necessary to
23   purchase the business, it was of no consequence to us.
24   Q.  Getting to the issue of coming to closing and

Page 8

1    showing up, where was closing supposed to be?
2    A.  To be held at the store, September 1st, at the
3    store.
4    Q.  The Basin Road Shopping Center?
5    A.  That's correct.
6    Q.  Do you know if Summer State, LLC, was going to
7    have an attorney present at the closing?
8    A.  I have absolutely no idea.
9    Q.  Were you going to be present at the closing?
10   A.  Sure.
11   Q.  Personally?
12   A.  Absolutely.
13   Q.  Were you anticipating having any counsel
14   present at the closing to represent JFS Holdings, Inc.?
15   A.  No. It's not necessary. This is a very
16   rudimentary sale. They are typically -- Laundromats are
17   traded at the premises at each location by the owner and
18   the buyer.
19   Q.  So, you were just going to show up, sign some
20   paperwork, transfer the funds?
21   A.  Well, if you read through the Asset Purchase
22   Agreement, the only thing that the owner would need to
23   provide at closing would be a bill of sale, and the
24   seller, in turn -- I am sorry, the owner -- the buyer, in

Page 9

1    turn, would come up with the balance of the funds that
2    would comprise the sale.
3    Q.  "The balance" being what's left over after a
4    deposit and the difference being the purchase price?
5    A.  That's correct.
6    Q.  And the purchase price being $140,000?
7    A.  That's correct.
8    Q.  And Summer State, LLC or Miss Sestito provided
9    you a deposit at the signing of the Asset Purchase
10   Agreement?
11   A.  That is correct.
12   Q.  And was that deposit $14,000?
13   A.  That is correct.
14   Q.  Do you recall who actually gave you that
15   deposit? Was it drawn on a personal checking account or
16   an entity account as in Summer State, LLC?
17   A.  That, I do not recall.
18   Q.  Did you deposit the check?
19   A.  That was deposited in the Ellsher Group escrow
20   account to be held, obviously, pending closing.
21   Q.  And was that deposit returned?
22   A.  It was.
23   Q.  When was it returned?
24   A.  Sometime after the 1st of September when Miss

## Brendan Sherman

4  (Pages 10 to 13)

Page 10

1  Sestito issued a letter stating that she was no longer
2  willing to close since we did not get the landlord to
3  consent.
4      Q.  Did Miss Sestito inform you of any other
5  reason why she did not want to close?
6      A.  That was the basis of not closing.
7      Q.  The Ellsher Group, Inc., when Miss Sestito or
8  Summer State, LLC had dealings with purchasing this
9  underlying asset, being the Laundromat, was she aware
10 that the Ellsher Group was acting as an intermediary or
11 as a broker?
12     A.  Oh, absolutely.
13     Q.  And was she aware that JFS Holdings, Inc.,
14 actually owned the asset?
15     A.  Of course she would because she would have
16 read the Asset Purchase Agreement, which was between JFS
17 Holdings and Summer State.
18     Q.  Was she aware at any time during your
19 negotiation, prior to executing the Asset Purchase
20 Agreement, that you were an owner, a stockholder, or
21 founder involved in both the JFS Holdings and Ellsher?
22     A.  She knew that I had a -- I had disclosed to
23 her that I had a personal interest in that Laundromat in
24 that I had a personal stake that I was a part owner in

Page 11

1  JFS.
2      Q.  When did you disclose that to her?
3      A.  Sometime right around when we signed the Asset
4  Purchase Agreement.
5      Q.  What was her reaction to that?
6      A.  There was no reaction.  She knew at that time.
7  She was very concerned as to who was going to train her
8  to do repairs and how to work on this equipment, and I
9  told her that I would be doing it personally for the two
10 weeks, as we had agreed upon, post closing.
11     Q.  Did you advise her, inform her that you were
12 involved or had a personal stake verbally or was it in
13 writing?
14     A.  Verbally.
15     Q.  How long would you say your dealings or your
16 negotiations were prior to entering into the Asset
17 Purchase Agreement dated August 1st?
18     A.  A couple of weeks.
19     Q.  And do you know how she actually found the
20 business for sale?  Was it through the web solicitation?
21     A.  That's correct.
22     Q.  And when was her first contact with you?
23     A.  Probably somewhere in the latter half of June
24 or early July.

Page 12

1      Q.  Of 2005?
2      A.  That's correct.
3      Q.  As to the solicitation or the business for
4  sale, who was the contact at the Ellsher Group, Inc.,
5  for --
6      A.  That was me.
7      Q.  So, you were the contact person?
8      A.  That's correct.
9      Q.  So she knew to contact you and you were
10 discussing all the logistics and the parameters of the
11 purchase?
12     A.  I explained to her how it worked.  I explained
13 to her how the business worked.  I explained to her what
14 would be needed in order to purchase the business.  I
15 explained to her that an Asset Purchase Agreement would
16 need to be executed.  She would call me from time to time
17 to talk about the best ways, you know, for her to own the
18 business, etcetera, in my opinion, and I tried to help
19 her where I could.
20     Q.  What documentation did you provide her for her
21 to do her due diligence to purchase the business?
22     A.  The owner would never provide any
23 documentation to do due diligence.  It would be upon the
24 perspective purchaser to do their due diligence.

Page 13

1      Q.  How about as far as determining the purchase
2  price, did you provide her any profit/loss statements,
3  balance sheets?
4      A.  I believe I gave her an income statement and
5  the utility bills.
6      Q.  Did she ask you for anything else?
7      A.  Not to my recollection, no.
8      Q.  So, you entered into an Asset Purchase
9  Agreement October 1st, 2005?
10     A.  That's correct.
11     Q.  Between October 1st --
12     A.  Wait a minute.  That's not correct.  What's
13 the date on that?
14     Q.  August 1st, 2005.
15     A.  You keep saying "October."
16     Q.  Excuse me --
17     A.  You just said "October," for the record, and
18 that's why -- I knew that wasn't correct.
19     Q.  Between August 1st and September 1st, what
20 dealings or documents were provided by Miss Sestito to
21 you?
22     A.  What documents were provided by Miss Sestito
23 to myself?  I don't recall receiving anything from her
24 but for the deposit?

Brendan Sherman

5 (Pages 14 to 17)

Page 14

1    Q. So just a check?
2    A. Yeah. Once the deposit comes in, in this
3  business, you know these people are for real. Typically,
4  they either don't come up with the money and you know
5  that they don't have the ability to close the
6  transaction, or they come up with it and you schedule
7  closing so you know in such a short time after you
8  receive the down payment that you are not wasting any
9  time.
10    Q. How did you know she had financing or was
11  going to come up with the deposit?
12    A. She told me.
13    Q. So you were moving along for a September 1st
14  settlement date?
15    A. Sure.
16    Q. Part of the Asset Purchase Agreement,
17  specifically on page 5, paragraph 13, here is a paragraph
18  that's captioned "Contingencies." Are you aware of that
19  particular paragraph?
20    A. I will tell you what, it would be really good
21  if you could provide me a copy of that and we could both
22  look off it together so I am not sort of guessing as to
23  what you are looking at because I haven't reviewed that
24  document in a year. Do you have a copy for me to look

Page 15

1  at?
2    Q. Yes. For the record, I am going to provide
3  Mr. Sherman a copy of the Asset Purchase Agreement.
4    A. Thank you.
5    Q. Which also, for the record, this was the same
6  Asset Purchase Agreement which was attached to the
7  initial complaint.
8    A. That's correct. Okay. Your question, sir?
9    Q. Paragraph 13, "Contingencies," specifically A,
10  can you just read that for the record?
11    A. "The seller's assignment of the Real Estate
12  lease for the business to the purchaser without any
13  modifications in the term of the lease whatsoever".
14    Q. Did you prepare an assignment of the lease for
15  Miss Sestito or her underlying entity, Summer State, LLC?
16    A. No. We never got that far.
17    Q. Why didn't you?
18    A. Because your client refused to give his
19  consent to the assignment so we weren't going to waste
20  our time in drafting an assignment for a lease that he
21  refused to sign.
22    Q. So, settlement date was scheduled for
23  September 1st. When did my client, Abessinio Property
24  Management, Inc., or Dr. Abbesinio, receive notice that

Page 16

1  you were involved in attempting to sell the asset?
2    A. The latter half of August.
3    Q. Would you say after August 15th?
4    A. I'd be guessing, but that sounds about right.
5    Q. But sometime after August 15 and obviously
6  before the tentative closing date?
7    A. Yeah. I think if you look at our answers to
8  your interrogatories, there is a date on correspondence
9  which makes up and comprises the exhibits to the
10  complaint, and I think that there was a date that we were
11  able to back into which was sometime between August 15th,
12  if memory serves, and August 21st, or something like
13  that.
14    Q. So, at the open end of the envelope, the
15  landlord had about two weeks' notice?
16    A. Yes.
17    Q. Of the tentative closing date?
18    A. I think that's correct.
19    Q. And you provided a copy of an application
20  which was filled out and prepared by Miss Sestito?
21    A. No. Your client provided it to me. I then
22  forwarded it to Miss Sestito, who filled it out, and I
23  forwarded it back to your client.
24    Q. And that was done after the August 15, 2005,

Page 17

1  and before closing?
2    A. What had happened was I personally contacted
3  your client.
4    Q. Do you remember when you contacted him?
5    A. Within the time frame we are talking about. I
6  advised him of the fact that there is a pending sale,
7  which, obviously, would be contingent upon receiving his
8  consent on an assignment of the lease. He, in turn, said
9  that he would be providing -- things that he would
10  require or he would need to have an application filled
11  out. He asked me for my fax number. I provided it to
12  him. And he provided me that application that afternoon,
13  which I, in turn, faxed over to Miss Sestito.
14    Q. Did the landlord request a copy of your
15  underlying Asset Purchase Agreement or any other
16  financials which were provided as part of the Asset
17  Purchase Agreement?
18    A. No. The application that we are referring to,
19  unfortunately, it's not part of the record here, but that
20  application was what your client wanted, apparently, and
21  the basis of having that application was for him to run a
22  credit check on Miss Sestito.
23    Q. Do you know if a credit check was actually
24  ran?

Brendan Sherman

6 (Pages 18 to 21)

| Page 18 |
| --- |

1    A.  It was.  Do you have a copy we can take a look
2  at?
3    Q.  No.
4    A.  Because your client has advised me that it
5  came back stellar.
6    Q.  As to the paragraph 13, contingency A, it
7  doesn't mention anywhere in there that the landlord shall
8  approve an assignment.  It just says that the seller
9  shall assign his lease.
10    A.  No.  Let's be very clear so that we clear up
11  the record.  Let me read 13 A in its entirety.  "Seller
12  and purchaser's obligations to proceed to settlement
13  hereunder is contingent upon the following:  The seller's
14  assignment of the Real Estate lease for the business to
15  the purchaser without any modifications in the terms of
16  the lease whatsoever."
17    Q.  That's correct.  That paragraph calls for the
18  responsibility of the seller assigning the Real Estate
19  lease?
20    A.  No.  That paragraph puts the onus on the
21  seller to get the landlord to assign the lease to the
22  purchaser.
23    Q.  So --
24    A.  That is a standard clause -- by the way, just

| Page 19 |
| --- |

1  so you know, this Asset Purchase Agreement was not custom
2  made for this sale.  It is used in every laundry sale
3  that the Ellsher Group does.
4    Q.  So, this particular contingency, your reading
5  of it is that the seller's assignment of the Real Estate
6  for the lease for the business to purchase without any
7  modification of the terms of the lease whatsoever, is
8  also contingent on the landlord approving the particular
9  assignment?
10    A.  It has nothing to do with the seller assigning
11  the lease because, obviously, the seller can't assign a
12  lease without the landlord.  This paragraph clearly means
13  that the seller's obligation is to get the landlord to
14  agree to the assignment of the lease to the purchaser.
15    Q.  So, it's your position that an assignment
16  cannot be unilaterally given by a seller to a purchaser
17  independent of the landlord?
18    A.  Without the landlord's consent.  I made that
19  very clear to Miss Sestito up front.  You will see all
20  the correspondence is consistent with getting the
21  landlord's consent.  That's what this whole thing has
22  been about.
23    Q.  And it's your position, but for the landlord
24  's consent, closing would have taken place?

| Page 20 |
| --- |

1    A.  That's correct.
2    Q.  Part of the agreement of sale, which I had
3  forwarded over to you, are also --
4    A.  Can I just clear up the record?
5    Q.  Sure.
6    A.  Are you referring to the Asset Purchase
7  Agreement as the agreement of sale?
8    Q.  Asset Purchase Agreement is also the agreement
9  of sale or the contract.
10    A.  That's correct.
11    Q.  Are you familiar with -- and I can provide you
12  a copy if you need your recollection refreshed -- a
13  letter dated September 1st, 2005, from Roseann Sestito?
14    A.  Here is what I am going to do:  I am going to
15  request that you provide me a copy of every document for
16  which you are referring to so that I can look at it, tell
17  you if I recognize it, and answer questions about it.
18  Would that be fair?
19    Q.  That's perfectly fair.  For the record, this
20  was a document which was not provided by the plaintiff
21  pursuant to a request for discovery.
22         (Discussion off the record.)
23  BY MR. MATLUSKY:
24    Q.  Mr. Sherman, I just presented to you a

| Page 21 |
| --- |

1  document which is labeled as Defendant's Exhibit 1.  It's
2  a fax to Brendan Sherman/Ellsher Group, Inc.
3         Do you have that in front of you?
4    A.  I do.  Okay.  I have read it.
5    Q.  Have you ever seen this document before?
6    A.  I don't have any recollection of it and I do
7  not possess it.  I am not saying that I didn't receive
8  it, but I know, for instance, that the date of this is
9  September 1st, '05, and I believe that if you look at
10  Exhibit G to the complaint, Miss Sestito and I were still
11  working towards a closing past that date.
12    Q.  Okay.
13    A.  So what I am saying to you is:  It may have
14  been provided, but, clearly, based on what is, off the
15  top of my head, Exhibit G to the complaint, this was
16  superseded by that because that clearly acknowledges that
17  we -- I think what may have happened is she was sending
18  this to me to cover herself on 9/1/05, since settlement
19  didn't occur as of that date.
20    Q.  So, as far as the comments on the fax, which
21  is dated 9/1/05, Defendant's Exhibit 1 --
22    A.  Right.
23    Q.  -- she goes on, and this is Miss Sestito,
24  Roseann Sestito, she addressed it Brendan.  The second

## Brendan Sherman

| Page 22 | Page 24 |
|---|---|

**Page 22**

1  paragraph of that particular fax, it says, "I wanted to
2  have an inspector come out to look at the business before
3  settlement date and since the settlement date is today,
4  there is no way an inspector can review it ahead of time.
5  Please send me the down payment of $14,000 less the $40
6  fee you paid.  Thank you.  Roseann Sestito."
7          Is that an accurate reading of the
8  paragraph two?
9      A.  That's correct.
10      Q.  And the remainder of the fax?
11      A.  I forgot, we paid your client $40 to have them
12  run that credit check.  I forgot about that, and you
13  don't have a copy of the credit report that we paid for,
14  sir?
15      Q.  I don't have a copy physically in my
16  possession, not to say that there is not a copy of a
17  credit report?
18      A.  You haven't seen it?
19      Q.  I don't have a copy and I believe my client is
20  in the process of trying to find it or is providing a
21  copy.
22      A.  I request, for the record, a copy of that
23  credit report when you --
24      Q.  Just by way of clarification, Federal Rules,

**Page 23**

1  as far as requests for particular documents or items
2  which should be provided into evidence shall be requested
3  by way of request for production, just by way of
4  clarification.
5          Now, September 2nd, 2005, you received a
6  letter that you previously, about two or three minutes
7  ago, mentioned that you thought it was Exhibit G.
8      A.  Thank you.
9      Q.  Coupled with the complaint, and you are
10  correct, that is, in fact, Exhibit G, which is also
11  labeled as Defendant's Exhibit 2, which will be made part
12  of this transcript.
13          Can you just reacquaint yourself with
14  that particular letter?
15      A.  I am.
16      Q.  The crux of that letter, with your reading, is
17  what?
18      A.  We could not get the assignment of the Real
19  Estate, and, therefore, she did not want to extend
20  closing any further and she wanted her money back and she
21  was going to either look for another business to
22  purchase, but either way, realized that she couldn't go
23  through the closing because we couldn't get the
24  assignment.

**Page 24**

1      Q.  Did you offer any extension or an addendum to
2  the Asset Purchase Agreement or the contract to extend
3  settlement a week or two until maybe a clarification or
4  an assignment, the issue could be resolved?
5      A.  I, obviously, told her that I was still
6  working towards it, but by this point, by September 2nd,
7  2005, your client had made it very clear that he was
8  refusing to provide his consent, and I advised
9  Miss Sestito of that.
10          I didn't see any other way around it at
11  that point.  I said that -- I told her at that point that
12  I understood if she wanted her money back, and she said
13  she did.  I asked her for this letter, she provided it to
14  me, and we gave her her money back.
15      Q.  During that time, prior to September 2nd,
16  2005, did you inform Miss Sestito that you were planning
17  on filing a claim against Abessinio, the landlord?
18      A.  I said that may be an avenue which we need to
19  go down in order to try to get his consent.
20  BY MS. DIROCCO:
21      Q.  I have a question.  Why, if the September 1st
22  letter mentions the -- the reason that she doesn't want
23  to go through with everything was because of the
24  inspection, do you know why it was necessary for her to

**Page 25**

1  send a letter on September 2nd, stating a different
2  reason?
3      A.  Well, ma'am, you have got to look at it this
4  way:  If you go back to paragraph 13 C of the Asset
5  Purchase Agreement, that says, "The purchaser performing
6  (within a reasonable time prior to settlement) a physical
7  inspection of the business and receiving a satisfactory
8  report from its agents regarding its condition."
9          She coming to me saying, on September
10  1st, that she had an inspector who wanted to look at
11  the property as of the date of closing, was not within a
12  reasonable time, she had a month to do so, and that would
13  not have been able to get her money back.  We worked
14  beyond the closing on September 1st because we were both
15  waiting for the landlord to give his consent.
16          As you can see, the letters that I am
17  sending to your client work right up to the date of
18  closing, every day, asking, Can't you give your consent?
19  Here is what she is willing to do?  Miss Sestito upped
20  her offer each and every day going up to closing.  It
21  started with an assignment of a lease.  What.
22          It ended with was Miss Sestito giving a
23  personal guarantee, the Summer State Corporation being
24  the -- being on the lease, being on the hook, if you

Brendan Sherman

8 (Pages 26 to 29)

Page 26

1  will, with her personal guarantee behind it, and as a
2  last stitch effort, Miss Sestito offered, I think it was
3  up to three-month's rent prepaid so that your client felt
4  comfortable with the new tenant. That was dismissed out
5  of hand by your client.
6      Q. But to answer my question: Do you know why
7  she sent the second letter?
8      A. It was at my request.
9      Q. You requested that -- did you request that she
10 include the specific language about the assignment?
11     A. Absolutely not.
12     Q. So what did you request of her?
13     A. I asked her for a letter setting forth why she
14 did not want to proceed with the transaction. She
15 provided it to me. This was sufficient. I called her, I
16 said, Roseann, I received the letter; thank you very
17 much; I will be cutting the check tomorrow; you will get
18 it in the mail within two days.
19     Q. So, to be clear, the September 1st fax letter
20 was not sufficient; according to you, the September 2nd
21 letter was sufficient?
22     A. I don't have any recollection of receiving the
23 September 1st fax transmission, but, clearly, she and I
24 were working post September 1st to try to close this. I

Page 27

1  think my letters to your client go up to the date, I
2  don't recall exactly when they go up to, still pleading
3  for the assignment, and that wasn't given.
4  BY MR. MATLUSKY:
5      Q. So, it's your position, but for the
6  assignment, Miss Sestito or Summer State, LLC would have
7  purchased this Laundromat?
8      A. Here is what we did: She wanted to have an
9  inspector come in there, and we had no problem with that.
10 She scheduled that at least three or four times. And
11 every time she would call me and say, Has the landlord
12 given his consent because I don't want to go to the cost
13 of paying for an inspector if I know that this can't
14 happen because we can't proceed without the lease, and
15 she did that up to closing. And we wanted to work with
16 her.
17     We said, Look, if you -- if we get the
18 consent from the landlord tomorrow, schedule the guy for
19 the next day, and she scheduled him at least three or
20 four times and cancelled him and called us and cancelled,
21 saying, I want you to know I cancelled this gentleman
22 from coming out since we couldn't get an assignment from
23 the landlord.
24     Q. So, is it your position that but for the

Page 28

1  assignment, and assuming the -- this inspection was
2  fine --
3      A. This is a cursory assignment, walk through --
4  it's a walk through type thing.
5      Q. Your position is she would have proceeded to
6  closing?
7      A. Absolutely. She had given us the $14,000.
8  She was very serious about closing. She was very excited
9  about the September 1st closing. We worked very hard to
10 still close on September 1st.
11     Q. Did Miss Sestito raise a concern to you
12 approaching closing that she was not aware of the fact
13 that you were affiliated or a member or had some kind of
14 interest in both the underlying asset and acting as the
15 intermediary, Eisher (sic) Group?
16     A. Elsher Group, that's E-l-l-s-h-e-r, G-r-o-u-p.
17     Q. Ellsher Group?
18     A. Not at all. In fact, she thanked me
19 continuously. She knew that I was going to be personally
20 providing two weeks of training, so there could be no
21 surprise, leading up to September 1st, that I had a
22 personal interest in the ownership of that business in
23 that how would someone who did not have an ownership
24 interest or an employment interest, let's say, with JFS,

Page 29

1  do two weeks of hard training on the machines with her?
2      Q. I suppose that could be possible without
3  someone having an ownership interest; however --
4      A. I guess the question would be why would they
5  do that?
6      Q. That's a question for that individual person.
7  But I suppose it could be done.
8          Did you inform her of your interest or
9  did she find out --
10     A. I have asked and answered this. I have told
11 you repeatedly that I told her, somewhere around the time
12 of signing the Asset Purchase Agreement, that I had a
13 personal interest in the laundry and that I would be
14 providing the training personally for her for the two
15 weeks per the agreement post closing. I hope I am not
16 going too fast.
17     Q. Pursuant to the Asset Purchase Agreement and
18 Dr. Abbesinio's letters and correspondence between you
19 and him requesting the assignment, were the other issues
20 addressed? Did you provide Miss Sestito a copy of the
21 lease?
22     A. Yes.
23     Q. And did you provide her a copy of the CAM
24 charges, the common area maintenance charges?

Brendan Sherman

9 (Pages 30 to 33)

Page 30

1    A.  There are no common area maintenance charges.
2  But if you are asking: Did I provide her with the
3  quarterly payments designating our share, 'our' being
4  JFS' share of the strip center's insurance, sewage, and
5  taxes, yes. Everything that was an obligation to provide
6  to her in the Asset Purchase Agreement was provided to
7  her. Everything that she needed, she received.
8    Q.  Why did JFS Holdings, Inc., refuse to sign a
9  guarantee for one year?
10   A.  Well, this is the first time you guys aren't
11  calling it a personal guarantee. I guess you have
12  figured out that the personal guarantee can't be signed
13  by a corporation.
14   Q.  We can phrase it a personal guarantee.
15  Whether it's personal to the corporation — it could be
16  splitting of terms or splitting of hairs.
17   A.  Quite frankly, no, it's not a splitting of
18  hairs and I wanted to make sure that that was on there.
19  The interrogatories requested why didn't JFS Holdings, as
20  a corporate entity, provide a personal guarantee? As I
21  am sure, hopefully, you are aware, a corporation is its
22  own legal entity and cannot provide a personal guarantee.
23  That can only be done by an individual. So I just want
24  to clear up the record as to what you are asking.

Page 31

1    Q.  The definitions and instructions pursuant to
2  defendant's first set of interrogatories directed to
3  plaintiffs, under the "Definition" paragraph, it
4  specifically calls for the terms you, your, or yours
5  refers to plaintiff.
6    A.  Which is JFS Holdings, Inc.
7         MS. DIROCCO:  And any plaintiff's
8  agents, employers, service, workmen, other
9  representatives acting on plaintiff's behalf. So that
10  would include a personal guarantee.
11        THE WITNESS:  No, it wouldn't, because
12  you would have to, in that interrogatory, direct the
13  exact person that you are asking for — but let's move
14  off this because I don't have time to deal with this.
15        If you are asking why JFS Holdings would
16  not provide a guarantee, because it would no longer own
17  the business. It would have no control. It wouldn't
18  have the keys to the business. If anything went wrong,
19  JFS couldn't do anything to minimize its loss. JFS
20  couldn't enter the business. That, in partial part, off
21  the top of my head, is one of the reasons why JFS
22  wouldn't do that.
23        Secondly, JFS would not provide a
24  personal guarantee or, I am sorry, I apologize, a

Page 32

1  guarantee since the landlord had a new tenant that was
2  providing not only the assets unencumbered in Summer
3  State, but also a personal guarantee and a few months
4  prepaid rent. So he had a suitable tenant and did not
5  need additional security.
6  BY MR. MATLUSKY:
7    Q.  So, you refused on behalf of JFS and/or
8  yourself?
9    A.  No, just as of JFS. It had nothing to do with
10  me personal.
11   Q.  Would you personally --
12   A.  Absolutely not. Why would I -- does your
13  client --
14   Q.  You have answered the question.
15   A.  Does your client have a personal guarantee
16  right now? Does he have a personal guarantee right now?
17   Q.  He has a lease with JFS Holdings, Inc., but
18  for sake of this particular assignment in question, if it
19  came up that you, personally, Brendan Sherman --
20   A.  Absolutely not.
21   Q.  -- you would not have signed a personal
22  guarantee?
23   A.  Absolutely not.
24   Q.  And also, based off what you just said,

Page 33

1  neither would corporate entity JFS Holdings, Inc.?
2    A.  That's correct.
3    Q.  Even knowing now that JFS Holdings, Inc., in
4  essence, lost the sale of the business for 150,000 --
5    A.  140,000.
6    Q.  140,000, excuse me, you would not give any
7  weight to signing a corporate guarantee, JFS, Inc.?
8    A.  Can we go off the record for a minute?
9    Q.  No. I'd prefer to stay on the record for
10  this.
11   A.  We are touching on settlement discussions here
12  and I think they should be off the record. You are
13  touching on settlement discussions. You know better than
14  this. Go off the record and we will -- I will ask you
15  questions. We can then go back on the record and you can
16  put on there whatever you want.
17   Q.  It's my position that we are not dealing with
18  settlement discussions, however, we will go off the
19  record.
20        (Discussion off the record.)
21  BY MR. MATLUSKY:
22   Q.  Do you know if Miss Sestito ended up
23  purchasing a different business?
24   A.  I have no idea. The last I spoke to her was

## Brendan Sherman

10 (Pages 34 to 37)

Page 34

1   the day I received a letter dated September 2nd, and I
2   advised her, as I previously stated, that I received it
3   and I would be cutting her a check the next day for the
4   return of her money.
5       Q.  You had no further verbal discussions?
6       A.  After that -- whether it was the 3rd, the day
7   after, that was my last discussion with her, telling her
8   that I received the letter, apologized that this couldn't
9   happen, and that she would get her money less the $40 fee
10  that was paid to your client within a couple of days.
11  And she did.
12      Q.  Verbal or written discussions?
13      A.  No.  This was a -- to the best of my
14  knowledge, recollection, etcetera, this was the last
15  thing I received from Miss Sestito.  Whether or not it
16  was -- it's dated September 2nd.  Quite frankly, I
17  remember working with her almost through the 5th of
18  September, but, you know, whenever I received this, it
19  was sometime between the 2nd and the 5th, and that was
20  when my conversation was.
21      Q.  When you returned the deposit, the $14,000
22  security deposit, prepaid deposit --
23      A.  Well, it's a down payment.
24      Q.  Down payment, you returned that after you

Page 35

1   received the September 2nd, 2005, letter?
2       A.  Yeah.  Because I said I want written
3   confirmation that you are cancelling the sale.
4       Q.  Would you have returned her deposit and
5   cancelled the sale, knowing what went on, without written
6   confirmation from Miss Sestito?
7       A.  Well, no.  I think that if you are going to
8   pull out of the Asset Purchase Agreement, there needs to
9   be a written acknowledgment of why you are terminating
10  the agreement.
11      Q.  She provided you a September 2nd, 2005, notice
12  considering the agreement of sale or contract null and
13  void.  After that, did you, by way of any of the
14  entities, provide a letter, correspondence, or release to
15  her releasing her of any of her contractual rights, other
16  than the return of the security deposit?
17      A.  I don't recollect sending her anything but a
18  check.
19      Q.  Do you recall if there was a cover letter or
20  anything associated with that return of the check?
21      A.  There could have been.  I don't recall.  I
22  don't have it.  It's not in my records.
23      Q.  I am going to take a recess for 30 seconds.
24      A.  That's fine.

Page 36

1       (Recess taken.)
2       MR. MATLUSKY:  At this point, we have no
3   further questions for the deposition and it's over.
4       (The deposition was concluded at 11:38
5   a.m.)
6
7       - - - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 37

1           INDEX TO TESTIMONY
2
3   BRENDAN SHERMAN                    PAGE
4   Examination by Mr. Matlusky           2
5
6       - - - - -
7
8       INDEX TO EXHIBITS
9                   PAGE
10  (There were no exhibits marked for identification.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Brendan Sherman

11 (Page 38)

Page 38

1                    C E R T I F I C A T E
2    STATE OF DELAWARE:
                :
3    NEW CASTLE COUNTY:
4          I, Renee A. Meyers, a Registered Professional
5    Reporter and Notary Public, within and for the County and
6    State aforesaid, do hereby certify that the foregoing
7    deposition of BRENDAN SHERMAN, was taken before me,
8    pursuant to notice, at the time and place indicated; that
9    said deponent was by me duly sworn to tell the truth, the
10   whole truth, and nothing but the truth; that the
11   testimony of said deponent was correctly recorded in
12   machine shorthand by me and thereafter transcribed under
13   my supervision with computer-aided transcription; that
14   the deposition is a true record of the testimony given by
15   the witness; and that I am neither of counsel nor kin to
16   any party in said action, nor interested in the outcome
17   thereof.
18          WITNESS my hand this 31st day of May A.D. 2006.
19
20          _____
            RENEE A. MEYERS
21          REGISTERED PROFESSIONAL REPORTER
            CERTIFICATION NO. 106-RPR
22          (Expires January 31, 2008)
23
24



# Fax

| To: | Brendan Sherman/Ellsher Group, Inc. | From: | Roseann Sestito |
|---|---|---|---|
| **Fax:** | 610-935-4851 | **Pages:** | 2 |
| **Phone:** | 610-935-4851 | **Date:** | 9/1/05 |
| **Re:** | Basin Plaza Laundry | **CC:** | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● **Comments:**

Brendan,

The Asset Purchase Agreement for the business located at 509 Basin Road, Basin Road Plaza, New Castle, DE 19720 (AKA Basin Plaza Laundry) will now be considered void as of Sept. 1 2005.

I wanted to have an Inspector come out to look at the business before the settlement date and since the settlement date is today, there's no way an Inspector can review it ahead of time.

Please send me the down payment of $14,000 less the $40 fee you paid.

Thank you,


Roseann Sestito



## Roseann Sestito

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JFS HOLDINGS, INC., )
)
            Plaintiff, )
)
v. ) Civil Action No.
) 05-709-SLR
ABESSINIO PROPERTY MANAGEMENT, )
INC., )
)
            Defendant. )

            Deposition of ROSEANN A. SESTITO taken pursuant
to notice before Renee A. Meyers, Registered Professional
Reporter and Notary Public, in the law offices of The
Matlusky Firm, LLC, 1423 North Harrison Street,
Wilmington, Delaware, on Tuesday, May 30, 2006, beginning
at approximately 9:10 a.m., there being present:

APPEARANCES:

            THE MATLUSKY FIRM, LLC
            DAVID E. MATLUSKY, ESQ.
            TARA M. DIROCCO, ESQ.
             1423 North Harrison Street
             Wilmington, Delaware 19806
             for Defendant


                    CORBETT & WILCOX
                Registered Professional Reporters
        1400 French Street     Wilmington, DE 19801
                    (302) 571-0510
                www.corbettreporting.com

## Roseann Sestito

2 (Pages 2 to 5)

Page 2

1        ROSEANN A. SESTITO,
2       the witness herein, having first been
3       duly sworn on oath, was examined and
4       testified as follows:
5    BY MR. MATLUSKY:
6       Q.  Good morning.  I am David Matlusky and I am
7    the attorney for Abessinio Property Management and
8    Dr. Francis Abessinio, and with me this morning is my
9    associate, Tara Dirocco.  Before we start, I would just
10   like to go through just a few logistical or housekeeping
11   issues.
12       This is a deposition involving the case
13   of JFS Holdings, Inc. Versus Abessinio Property
14   Management, Inc.  I am going to ask you a few questions
15   to find out the facts giving rise to the underlying
16   lawsuit.
17       If you do not hear a question, say so
18   and I will repeat it.  If you do not understand a
19   question, say so and I will rephrase it.  If you realize
20   that an earlier answer that you gave was inaccurate or
21   incomplete, just interrupt and say that you want to
22   correct or supplement an earlier answer and you will be
23   allowed to do so.
24       If you need to stop to use the rest

Page 3

1    room, get a cup of coffee or water, just let me know and
2    you will be permitted to do so.  If you do not know or do
3    not remember information or know how to answer a
4    question, just say so.
5        Are you on any medication right now that
6    might impair your recollection?
7       A.  No.
8       Q.  Also, I am requesting that all questions be
9    answered verbally.  We have a stenographer here today and
10   she won't be able to interpret non-verbal communications
11   as to like a nod of the head, so if you can just
12   verbalize all your answers.
13      A.  Okay.
14      Q.  And, also, for the record, the witness, can
15   you state your name?
16      A.  Roseann Sestito.
17      Q.  Attorney David Matlusky and attorney Tara
18   Dirocco are the only people present for this deposition.
19       Now we are going to move on to a few
20   questions.
21      A.  Okay.
22      Q.  How do you know Brendan Sherman?
23      A.  I was looking for a business to buy last year,
24   I believe it was February, that's when I started looking

Page 4

1    for a business, and I came across a listing for a
2    Laundromat in New Castle County for sale on
3    Bisbuy/sell.com, which is where they buy and sell
4    businesses, and his name appeared as the contact for that
5    listing.
6       Q.  Do you recall the name of a business that was
7    advertising or was it just Brendan Sherman's name?
8       A.  No.  It was just his name.
9       Q.  And what kind of business was it?
10      A.  A Laundromat.
11      Q.  And after you saw his name at that point, what
12   did you do?
13      A.  I called him up to ask about the business.  It
14   said that he was the broker, so I called him up, asked
15   him about the business.  He gave me some information.  I
16   had to sign a disclosure agreement, I guess that's
17   normal, and he gave me the address and some information.
18      Q.  Do you recall if that agreement was a
19   confidentiality agreement?
20      A.  Yes.
21      Q.  When you were on the website, the internet,
22   looking for businesses to buy, what businesses were you
23   looking for?  Were you looking for this particular type
24   of business or just anything in general?

Page 5

1       A.  I looked at a lot of different businesses and
2    I did look for Laundromats because I did research them
3    beforehand.  I thought they would be a good business deal
4    to get into.
5       Q.  What other kinds of businesses did you
6    actually pursue?
7       A.  Let's see.  A website business that sells baby
8    merchandise.  That's what I ended up buying in September.
9       Q.  September of --
10      A.  '05.
11      Q.  Did you know Brendan Sherman at all prior to
12   your investigation of this business?
13      A.  No.
14      Q.  When you were investigating this business and
15   you signed this confidentiality agreement, what
16   information were you provided by Brendan Sherman?
17      A.  I was provided with the address to take a look
18   at the place where it was located initially.
19      Q.  And, again, you said what month was that --
20   what month would you say that you signed that
21   confidentiality agreement?
22      A.  Let me check.  I believe it was May 2005.
23      Q.  Did you have any contact with an Ellsher
24   Group, Inc.?

Roseann Sestito

3 (Pages 6 to 9)

**Page 6**

1    A.  Yes.
2    Q.  What was your involvement with them?
3    A.  He represented -- Brendan Sherman represented
4  the Ellsher Group as the broker.
5    Q.  Did you have any dealings with any particular
6  individual at the Ellsher Group, Inc.?
7    A.  Only Brendan Sherman.
8    Q.  So, there was no one else that you spoke with
9  as far as an individual that you can remember or had any
10  correspondence?
11    A.  Nobody else.
12    Q.  But you were -- you do recall the name Ellsher
13  Group, Inc.?
14    A.  Yes.  His correspondence had that name on
15  their paperwork.
16    Q.  And that was Brendan Sherman's correspondence?
17    A.  Yes.
18    Q.  Do you have any of that paperwork in your
19  possession?
20    A.  Yes.  I have the income statement with the
21  Ellsher Group listed on there that he provided to me.
22    Q.  So, for all intents and purposes, all your
23  dealings were with Brendan Sherman?
24    A.  Yes, sir.

**Page 7**

1    Q.  Were you aware of another entity called JFS
2  Holdings, Inc.?
3    A.  Yes.
4    Q.  And what's your understanding of that company?
5    A.  I was told by Brendan Sherman that JFS
6  Holdings were the actual owners of the Laundromat
7  business.
8    Q.  So, you signed this confidentiality agreement
9  in May of 2005.  How long were you negotiating with
10  Brendan Sherman as to the purchase of this business?
11    A.  Let's see.  I had the signed agreement for the
12  purchase in August 1, 2005.
13    Q.  So, you have an Asset Purchase Agreement dated
14  August 1st, 2005?
15    A.  Yes.
16    Q.  Do you remember if that is the date that you
17  actually executed that document or signed that agreement?
18    A.  Yes, it is.
19    Q.  Prior to signing that Asset Purchase
20  Agreement, were there any other agreements that you had
21  or draft agreements that went back and forth?
22    A.  I am trying to recall.  I was provided with, I
23  guess, the bills for the -- for a year.  I don't know if
24  that's what you mean.

**Page 8**

1    Q.  Well, when you signed the Asset Purchase
2  Agreement on August 1st, it was approximately an
3  eight-page document?
4    A.  Yes.
5    Q.  Prior to signing that, was there a back and
6  forth of the language of the -- or the content of the
7  Asset Purchase Agreement to review that you had to mark
8  up and send back to Brendan Sherman or --
9    A.  As far as the language, yes, I would say I
10  wanted to know exactly what I was getting into, so -- and
11  what my -- in case there was anything I guess I needed to
12  do before any contingencies that had to occur.
13    Q.  Did you have an attorney at that point
14  representing you in the purchase of the business?
15    A.  No.
16    Q.  Did an attorney, on your behalf, review the
17  Asset Purchase Agreement?
18    A.  Yes, they did.
19    Q.  What was the name of that attorney?
20    A.  I don't know.  It was a long time ago.  I
21  really don't remember.
22    Q.  Was it someone in Wilmington?
23    A.  Yes.
24    Q.  Do you know where they were located?

**Page 9**

1    A.  No.
2    Q.  Do you think you could find out the name of
3  that particular individual in the next couple of weeks?
4    A.  No, I don't think so.  It was one of those
5  things where they had an ad in the paper, and it was for
6  like $50, you could get a consultation, so I had them
7  look at it briefly.
8    Q.  Did you actually go to somebody's office?
9    A.  Yes.
10    Q.  Do you remember where the office was?
11    A.  I believe it was in Greenville somewhere.  I
12  am not sure.  Sorry.  But he just went over, you know,
13  what I needed to do.  I had my accountant look at it.
14    Q.  What's the name of your accountant -- the
15  accountant that you use?
16    A.  His name is Dennis -- Dennis --
17    Q.  Do you know where he is located?
18    A.  Greenville.  He is in my phone.
19    Q.  Just for the record --
20    A.  It just says "Dennis accountant" on it.
21  Sorry.
22    Q.  Miss Sestito is checking the phone number.
23    A.  Dennis -- I am completely at a blank.  I am
24  sorry.

Roseann Sestito

4 (Pages 10 to 13)

**Page 10**

1    Q.  That's fine.
2    A.  I don't remember.
3    Q.  Do you think you could provide the name in the
4    next week or so?
5    A.  Absolutely.  Yes.
6    Q.  Thanks.  How did the sales price of this
7    Laundromat or this business come about or how was it
8    determined?
9    A.  Well, when I first saw the listing, it must
10   have been in February or March of 2005, it was listed for
11   $135,000.  Brendan Sherman advised me that they, the
12   people that were selling the business, wanted to hold
13   onto it for a little bit.  It was about two months later
14   when either I contacted him or he contacted me, "The
15   price," he said, "they increased it by 5,000 to 140,000."
16   Q.  And is that the price that you agreed to in
17   the Asset Purchase Agreement?
18   A.  Yes.  That's correct.
19   Q.  So, at what point did you decide to buy the
20   business?
21   A.  At what point?
22   Q.  Prior to -- you signed the Asset Purchase
23   Agreement --
24   A.  August.

**Page 11**

1    Q.  August 1st?
2    A.  Right.
3    Q.  So, prior to that, what -- at what point did
4    you let Brendan know, Okay, I want to buy this place;
5    let's sign the contract?
6    A.  I believe it was in July.
7    Q.  July of 2005?
8    A.  July 2005.
9    Q.  And then during -- between July and actually
10   signing the contract, what were you doing as far as due
11   diligence or reviewing --
12   A.  I was looking -- reviewing the bills that he
13   sent me in order to calculate what the income would be
14   per year on the -- I was basically trying to calculate
15   what the -- his income statement had said.
16   Q.  What did he provide you with?  An income
17   statement?
18   A.  Yes.
19   Q.  What other documents do you recall that he
20   provided you with?
21   A.  Water bill, electric bill, Verizon bill, waste
22   management bill.
23   Q.  Did he provide you a copy of the lease, the
24   underlying lease agreement --

**Page 12**

1    A.  Yes, he did.
2    Q.  -- for this property?  When were you
3    anticipating actually to go to settlement or to close on
4    the purchase?
5    A.  September 1st.
6    Q.  Of 2005?
7    A.  Of 2005.
8    Q.  As to the purchase price, how were you
9    planning on financing that or paying for the business?
10   A.  I took out several loans.  I took out home
11   equity line of credit.  I borrowed from credit cards.  I
12   took out a personal loan.
13   Q.  During what time frame did you do that?
14   A.  Before I signed the agreement to make sure I
15   had enough money to pay for it.
16   Q.  So, it was before August 1st, 2005?
17   A.  That's correct.
18   Q.  And at that point, did you have the entire
19   amount, 150,000?
20   A.  140,000.
21   Q.  140,000, excuse me.
22   A.  Yes, I did.
23   Q.  In the Asset Purchase Agreement, there is a
24   reference to a deposit.

**Page 13**

1    A.  Yes, 14,000.
2    Q.  Did you provide that to Brendan Sherman?
3    A.  Yes, I did.
4    Q.  Do you have a copy of a cancelled check for
5    that?
6    A.  I don't think I do.
7    Q.  Who did you make that check payable to?
8    A.  I believe it was JFS Holdings.
9    Q.  Do you recall if that check was cashed or was
10   it just held?
11   A.  I am sorry.  It was the Ellsher Group that I
12   made the check out to.
13   Q.  You made the check payable to Ellsher Group?
14   A.  Right.
15   Q.  Do you know when that was dated, that
16   particular check, roughly?
17   A.  August '05.
18   Q.  Do you know when in August?  Was it given
19   after the Asset Purchase Agreement was signed or with the
20   Asset Purchase Agreement?
21   A.  It was given with the Asset Purchase
22   Agreement.
23   Q.  And do you remember if that check was cashed?
24   A.  It was not cashed.

Roseann Sestito

5 (Pages 14 to 17)

Page 14

1     Q.  Was the check ever given back to you?
2     A.  Yes, it was.
3     Q.  Did you ever discuss financing the purchase
4   with a financing company or a bank?
5     A.  I was advised by Brendan Sherman that because
6   the tax returns were not clear, that I wasn't able to get
7   bank financing.
8     Q.  What year tax returns did he provide you with
9   for the business?
10    A.  He did not provide me with any tax returns
11  because I was told that the people that owned the
12  Laundromat also had other Laundromats that they owned and
13  it would be very unclear as to what income came from this
14  particular Laundromat.
15    Q.  Did the accountant that you use, did he raise
16  any questions as to requiring those particular tax
17  returns?
18    A.  Yes, but it wasn't available, so I went with
19  the expenses that he gave me in order to calculate what
20  the income would be from the water use.
21    Q.  How many years' worth of expenses did he
22  provide?
23    A.  One full year.
24    Q.  Was your accountant satisfied with any

Page 15

1   documents that were provided by Brendan Sherman?
2     A.  I would say not, but I was satisfied because I
3   researched how to calculate what the income would be from
4   the water bills.
5     Q.  Did your accountant advise you one way or
6   another to proceed with the purchase based on the
7   financials or any of their representations or bills that
8   were provided?
9     A.  No.  I made the decision on my own, but it was
10  because I told them that I calculated what I did and it
11  came out to be what was told to me as far as what the
12  revenue would be.
13    Q.  Did the seller or Brendan Sherman provide you
14  a copy of CAM charges, also known as common area
15  maintenance charges?
16    A.  He advised me what they would be.
17    Q.  Were you satisfied with the CAM charges and/or
18  the lease that he provided?
19    A.  Yes.
20    Q.  One of the contingencies in the Asset Purchase
21  Agreement involved the seller providing an assignment of
22  the lease to the purchaser.
23        Are you aware of any issues involving
24  the assignment?

Page 16

1     A.  Yes.
2     Q.  Are you aware that there was a contingency
3   language in the contract, in the agreement of sale?
4     A.  Yes.
5     Q.  Do you know what page on the agreement of sale
6   the contingency language appeared?
7     A.  Yes.
8     Q.  What page was that?
9     A.  Page 5.
10    Q.  Would that be page 5, paragraph 13?
11    A.  Paragraph 13, yes.
12    Q.  In particular, would that be paragraph 13,
13  section A?
14    A.  Yes.
15    Q.  At what point did Brendan Sherman advise the
16  landlord of his intent or his representation or him
17  trying to sell this business to someone?
18    A.  As far as I know, it wasn't until the very
19  last minute.
20    Q.  What do you mean by "the very last minute"?
21    A.  I would say in August.
22    Q.  Roughly the last week of August?  The middle
23  of the month?
24    A.  I would say the third week in August.

Page 17

1     Q.  Prior to Brendan Sherman advising the landlord
2   of his intent to sell the business --
3     A.  I am sorry.  Can I -- it's August 15th, middle
4   August, not the third week.
5     Q.  Middle of August is -- let's just discuss that
6   for a second.  Middle of August was when Brendan Sherman
7   advised the landlord that he was trying to sell the
8   business or --
9     A.  Yes.
10    Q.  -- that he was representing the sale of the
11  business?
12    A.  Yes.  I had to fill out a rental application
13  to purchase the Laundromat.
14    Q.  Who did you receive that application from?
15    A.  Brendan Sherman.
16    Q.  Did Brendan Sherman explain what that
17  application was for?
18    A.  I received a letter that said what it was for.
19    Q.  When was that letter dated?
20    A.  August 15th.  Excuse me.  August 15th is when
21  it was dated.  I didn't receive it until August 31st.
22    Q.  And who was that letter from?
23    A.  JFS Holdings.
24    Q.  And it was dated August 15th, 2005?

## Roseann Sestito

6 (Pages 18 to 21)

Page 18

1     A. Yes.
2     Q. And what did that particular letter reference?
3     A. The rental application for the person
4  attempting to purchase the Laundromat.
5     Q. And who is that letter addressed to?
6     A. It's addressed to Dr. Abbesinio.
7     Q. And how did you end up getting a copy of that
8  letter?
9     A. Brendan had sent it to me, a copy of it.
10    Q. Did you fill out that application?
11    A. Yes, I did.
12    Q. And what did you do with it?
13    A. I had to fax it over to -- I believe it was
14 Brendan.
15    Q. When did you do that?
16    A. It might have been Dr. Abbesinio. I am not
17 really sure.
18    Q. Do you recall when you actually faxed that or
19 sent that to either Dr. Abbesinio or Brendan Sherman?
20    A. It was sometime in August. Oh, I have it
21 right here. I am sorry. I sent it to Brendan Sherman
22 August 12th.
23    Q. It was sent on August 12th?
24    A. Yes.

Page 19

1     Q. The application?
2     A. The rental application.
3     Q. Completely filled out by you?
4     A. Yes.
5     Q. Prior to August 15th or August 12th, did you
6  have any conversations with Dr. Abbesinio?
7     A. No.
8     Q. Did you know Dr. Abbesinio?
9     A. No. I knew about him through Brendan.
10    Q. What did you know about him?
11    A. That he was the owner of the building that
12 held the Laundromat.
13    Q. And that he would be your landlord?
14    A. That's correct.
15    Q. Are you aware of any other contingencies that
16 were in the Asset Purchase Agreement?
17    A. Yes.
18    Q. What were they?
19    A. That I would have a physical inspection of the
20 business a reasonable time prior to the settlement.
21    Q. Did you conduct your physical inspection of
22 the property?
23    A. No. And -- should I keep going?
24    Q. Yes.

Page 20

1     A. The reason why that didn't happen is because I
2  wasn't sure if the -- the actual assignment of lease
3  would happen, and, therefore, I didn't want to pay for
4  someone to go in and inspect the business if I wasn't
5  going to have the lease assigned over to me. And, so, I
6  wasn't given any time to do the inspection because I
7  thought that, obviously, the sale wasn't going to go
8  through because the assignment of lease didn't happen.
9     Q. Did you provide any personal information to
10 the landlord, Dr. Abbesinio? "Personal information"
11 being personal financial statements or any other
12 information?
13    A. No.
14    Q. Any information supporting the -- your
15 financial backing for this?
16    A. No.
17    Q. You were going to be purchasing this business
18 in the name of an entity. Do you remember the name of
19 the entity?
20    A. Yes.
21    Q. What was that?
22    A. Summer State, LLC.
23    Q. Do you know if that entity was formed prior to
24 entering into the Asset Purchase Agreement?

Page 21

1     A. It was formed, yes, it was.
2     Q. Do you remember who formed it?
3     A. I formed it.
4     Q. And did you do the necessary filings with the
5  Secretary of State, do you remember?
6     A. Yes.
7     Q. Who else is involved in Summer State, LLC?
8     A. Nobody.
9     Q. Just you?
10    A. Just me.
11    Q. You are the sole owner, person involved?
12    A. Yes. That's correct.
13    Q. When you set up that company or that limited
14 liability company, where did you set it up? With what
15 state?
16    A. Delaware.
17    Q. Do you remember when that was actually set up?
18    A. I believe it was August, July or August.
19    Q. Was that entity set up strictly for the
20 purchase of this asset?
21    A. Yes.
22    Q. The "asset" being the Laundromat?
23    A. The Laundromat business, yes. I now use that
24 company for a different business.

Corbett & Wilcox

Roseann Sestito

7 (Pages 22 to 25)

Page 22

1    Q.  Would that be the business, the baby
2  merchandising business?
3    A.  Yes.
4    Q.  Were there any other issues prior to
5  settlement, towards the end of August, that were
6  unresolved between you and Brendan Sherman?
7    A.  Yes. Besides the inspection of the business
8  that I wasn't able to do because the assignment of lease
9  didn't occur, I was -- I feel like I was deceived by
10  Brendan Sherman because I was told by Dr. Abbesinio that
11  he is also the owner of the business.
12    Q.  Just by way of clarification, when you say
13  "owner of the business," what do you mean by that?
14    A.  The owner of the Laundromat business.
15    Q.  So, when did that information become relevant
16  or when did you become aware of that?
17    A.  When I spoke with Dr. Abbesinio.
18    Q.  Do you remember when that was? Was it after
19  August 15th or was it after --
20    A.  Yes, it was.
21    Q.  Was it before September 1st?
22    A.  Yes, it was.
23    Q.  Do you remember roughly how many days before
24  September 1st?

Page 23

1    A.  Maybe a week.
2    Q.  Who contacted who?
3    A.  I contacted Dr. Abbesinio because Brendan was
4  having trouble getting the lease assigned to him from
5  Dr. Abbesinio. He was giving him a hard time for some
6  reason.
7    Q.  When you say "he," who do you mean by "he"?
8    A.  Dr. Abbesinio was giving Brendan a hard time
9  about assigning the lease without him being on the lease
10  for at least a year.
11    Q.  Okay.
12    A.  And, so, I contacted Dr. Abbesinio about that
13  issue.
14    Q.  How did you become aware of that issue? Was
15  it --
16    A.  Brendan had told me that.
17    Q.  Okay.
18    A.  And, so, I contacted Dr. Abbesinio and he had
19  told me that he is the actual owner of the Laundromat
20  business, that Brendan is the owner of the business.
21    Q.  And, at that point, you weren't aware that he
22  had some kind of equity or he was involved in the actual
23  Laundromat, himself?
24    A.  At that point, I just wanted to get out of the

Page 24

1  contract as soon as possible.
2    Q.  Why did you want to get out of the contract?
3    A.  Because I felt like Brendan had totally
4  deceived me about this whole business, and he represented
5  himself as the broker, not the owner. He kept saying
6  "they," and, "They are raising the price," and, "They are
7  doing this," and, "Well, they can't talk to you because
8  they are busy." I was absolutely stunned at this whole
9  business transaction, and I just wanted to get out of it.
10  And I am still having nightmares about it.
11    Q.  Well, at that point, were you confused as to
12  Brendan Sherman's role in this whole interaction with you
13  as the buyer?
14    A.  At that point, I looked up the Ellsher Group,
15  I looked up JFS Holdings, I did research on my own and
16  found out that Brendan was the owner of the Ellsher Group
17  but he was also the owner of the Laundromat.
18    Q.  When did you find that out? Was that before
19  September 1st?
20    A.  Yes. And thank God that Dr. Abbesinio didn't
21  assign the lease over because I just wanted no part of
22  this deal at all.
23    Q.  So, at that point, if, before September 1st,
24  the tentative date for closing on the Asset Purchase

Page 25

1  Agreement, if the landlord, Dr. Abbesinio, agreed to
2  assigning the lease, would you have consummated the
3  purchase and gone through with it?
4    A.  I wouldn't have had a choice. I had told
5  Brendan that I no longer wanted it even if he had
6  assigned the lease to me, but Brendan had told me I
7  didn't have a choice since I signed the contract.
8    Q.  Have you or your entity been sued by any of
9  the parties involved in this case?
10    A.  No. I think if anyone should be suing, it
11  should be me, but I didn't want to go through with any of
12  this. I didn't want any part of this Laundromat anymore.
13    Q.  Did JFS Holdings, Inc., or Brendan Sherman
14  discuss the option with you of adding time to the closing
15  date of September 1st to go beyond September 1st or
16  resolve any issues that Brendan had with Abessinio?
17    A.  Yes. He wanted me to add another week or two
18  to the contract and I said, "No, the contract says
19  September 1st." I then sent him a letter that said I no
20  longer want any part of it. And I first sent him a
21  letter that said I wanted to have an inspector --
22    Q.  When you say "sent him a letter," was that
23  Brendan Sherman?
24    A.  Yes.

Roseann Sestito

8 (Pages 26 to 29)

Page 26

1    Q. What was the date of that letter?
2    A. That was the date of the original closing,
3  which would have been September 1st.
4    Q. What was the content of that letter?
5    A. I said that the Asset Purchase Agreement for
6  the business located at 509 Basin Road, New Castle,
7  Delaware, will now be considered void as of September
8  1st, 2005. I wanted to have an inspector come out to
9  look at the business before the settlement date, and
10  since the settlement date is today, there is no way an
11  inspector can review it ahead of time. Please send me
12  the down payment of 14,000, less the $40 fee you paid.
13    Q. And that was dated when?
14    A. September 1st, addressed to Brendan.
15    Q. And that was sent to him by way of fax?
16    A. I faxed it, yes.
17    Q. And did Brendan respond to that letter in any
18  way?
19    A. Yes. He called me up and told me that he
20  would send me the 14,000, but the reason that I was
21  giving here, the inspection, was not good enough, and I
22  said, "Okay. I will send you another letter," which I
23  believe I e-mailed it to him, that said, "Because the
24  assignment of the lease did not occur as of September

Page 27

1  1st, the contract is now void."
2    Q. Was the second letter that you sent, was that
3  at the direction of Brendan Sherman?
4    A. Yes.
5    Q. Did Brendan Sherman script that letter in any
6  way? Did he provide you with wording for it or send you
7  a draft copy of what to write?
8    A. No. He just told me verbally.
9    Q. And when did you send that letter?
10    A. It was the same day, September 1st.
11    Q. And who was that sent to?
12    A. Brendan Sherman, Ellsher Group.
13    Q. I am going to provide you a copy of a letter,
14  which is dated September 2nd, 2005, Brendan Sherman,
15  Ellsher Group. I am going to provide that for you to
16  look at.
17        Does that look familiar?
18    A. Yes.
19    Q. Do you recall writing that?
20    A. Yes.
21    Q. Was that the content of the letter due to
22  Brendan Sherman's suggestion?
23    A. That's correct, yes.
24    Q. Would you say that letter was scripted by him

Page 28

1  or directed to you to write that?
2    A. Well, since my first letter wasn't good enough
3  to void the contract and I wanted to get out of it any
4  way that I can, I said, Well, you know, obviously, you
5  don't have the lease assignment, so that's the reason
6  that I am going to give.
7    Q. When you say, "The first letter wasn't good
8  enough," what makes you think it wasn't good enough?
9    A. Mr. Brendan Sherman told me that.
10    Q. And why did he tell you it wasn't good enough?
11    A. Because he said I had plenty of time to get
12  the inspection completed before settlement.
13    Q. And what did this inspection consist of?
14    A. To have an expert in that field come out and
15  look at the shape of the building and the washing
16  machines, dryers, electric, plumbing.
17    Q. So, that inspection was never even scheduled?
18    A. It was scheduled a couple times; however, it
19  was never completed because I wasn't about to pay for
20  something if the settlement on this Laundromat
21  transaction was never going to happen anyway.
22    Q. As far as the actual purchase of the business,
23  did you procure liability insurance or any type of
24  insurance in anticipation of closing on this Laundromat?

Page 29

1    A. It was ready to have -- I was getting the
2  insurance, yes.
3    Q. Who was that through; do you remember?
4    A. No. I don't remember. I am sure I have it
5  somewhere in my many papers, but I don't have it with me.
6    Q. Did Brendan Sherman, at all, suggest that he
7  would keep your security deposit when you decided that
8  you didn't want to proceed with the closing?
9    A. When I first advised him that I wasn't going
10  to purchase due to the fact that I wasn't able to get the
11  inspection, he said that I was in violation of the
12  contract.
13    Q. And how much was your -- that deposit?
14    A. 14,000.
15    Q. And at that point he said you were in
16  violation, what were you thinking?
17    A. I said, "I can't believe this." And I wanted
18  to get out of it, you know, in any way that I can.
19    Q. Because you were thinking you would lose the
20  $14,000?
21    A. Yes.
22    Q. Were you thinking you would lose more than
23  $14,000?
24    A. Yes. I thought I would be sued because of the

Corbett & Wilcox

Roseann Sestito

9 (Pages 30 to 33)

Page 30

1  contract.
2      Q. How did the $14,000 deposit come about? How
3  was that derived?
4      A. Ten percent of the purchase price.
5      Q. Did you have any discussions with Brendan
6  Sherman after writing the September 2nd, 2005, letter?
7      A. Yes. He said he would send me the -- my
8  deposit back.
9      Q. And did he send that back?
10     A. Yes, he did.
11     Q. Did he provide you with any documents
12  releasing you of the contract or any corresponding
13  letters saying that you were released of the contract?
14     A. No. I don't remember any of that.
15     Q. I'd just like to pause for a second. That
16  particular letter, the September 2nd letter, if that can
17  be marked as exhibit, I think for sake of --
18     A. And I realize I sent it the next day, I guess.
19     Q. Okay. September 2nd, 2005?
20     A. Yes. Because I sent one September 1st, and I
21  guess that wasn't good enough, so September 2nd would
22  have been -- no, actually, yes, I do have that with me,
23  September 2nd. "Please see the attached letter for the
24  termination of the Asset Purchase Agreement."

Page 31

1      Q. Is that the one --
2      A. That's when I sent the second letter.
3      Q. So you also have a letter dated --
4      A. September 2nd.
5      Q. -- September -- you also have a letter,
6  though, dated September 1st?
7      A. That's right.
8      Q. And --
9      A. Which would have been the day before closing.
10     Q. Do you have a copy of the September 1st
11  letter?
12     A. Yes, I do.
13     Q. The September 1st letter, I would like marked
14  as deposition Exhibit 1.
15         (Defendant's Deposition Exhibit No. 1
16  was marked for identification.)
17         MR. MATLUSKY: And then, also, the
18  September 2nd, 2005, Defendant's Exhibit 2?
19     A. Do you think I could get a copy of what I just
20  gave you back? Is that possible?
21     Q. Sure.
22     A. I don't have that anymore. That's my only
23  copy.
24         (Defendant's Deposition Exhibit No. 2

Page 32

1  was marked for identification.)
2  BY MR. MATLUSKY:
3      Q. Did Brendan Sherman inform you in any way of
4  what he was going to be using the September 2nd letter
5  for other than letting you out of the contract?
6      A. He advised me that Dr. Abbesinio was in
7  violation of his contract with him. He didn't tell me he
8  was going to use my letter for anything.
9      Q. Did you mention, during your discussions after
10  August 25th, 2005, that he was anticipating filing a
11  lawsuit against Dr. Abbesinio?
12     A. He did mention that, yes.
13     Q. When did he mention that?
14     A. I would say the week before settlement, which
15  would have been September 2nd.
16     Q. The settlement was scheduled for September
17  1st. Would it have been before that?
18     A. Yes. It would have been about a few days
19  before September 1st.
20     Q. So, sometime at the end of August?
21     A. The end of August, yes.
22     Q. And what did he tell you he was going to do?
23     A. Well, he said that he is in violation of the,
24  you know, his assigning the lease -- his assigning the

Page 33

1  lease at the Basin Road Laundromat.
2      Q. So, just for clarification, Brendan Sherman
3  said that the landlord was in violation?
4      A. Yes.
5      Q. And then, at that point, he informed you that
6  he was going to sue him or did he not even get into those
7  kinds of details?
8      A. He didn't get into those details.
9      Q. But he made --
10     A. He made me aware that he was in violation.
11     Q. When did you find out that there was a
12  lawsuit?
13     A. When I got the subpoena.
14     Q. When was that?
15     A. That was about two weeks ago, I guess it was.
16     Q. So, that would be May of --
17     A. Maybe May 15th.
18     Q. 2006?
19     A. 2006.
20     Q. After September 1st or September 2nd --
21         MS. DIROCCO: May 5th.
22  BY MR. MATLUSKY:
23     Q. Just by way of clarification, May 5th, that's
24  the first time you became aware of --

Roseann Sestito

10 (Pages 34 to 37)

Page 34

1    A.  The actual lawsuit, yes.
2    Q.  Did you have any conversations with Brendan
3  Sherman after September 2nd, 2005?
4    A.  No.
5    Q.  And, at that point, you just went along your
6  way and just proceeded to buy another business?
7    A.  As soon as I got my deposit back, I started
8  looking for a different business.
9    Q.  Were you looking for that business during the
10  time that you had the Asset Purchase Agreement?
11    A.  Absolutely not, no.
12    Q.  How much did you buy that business for, the
13  baby merchandising business?
14    A.  $52,000.
15    Q.  And when did you buy that?
16    A.  I believe it was the end of September.
17    Q.  Of 2005?
18    A.  Of 2005.
19    Q.  So, soon thereafter, you --
20    A.  I started looking for a business right away
21  that had nothing to do with Laundromats or landlords or
22  anything like that.
23    Q.  So, if Brendan Sherman came back to you or if
24  you became aware that this alleged underlying issue

Page 35

1  involving the lease was resolved between September 2nd
2  and the end of September, would there be any way that you
3  would have even considered getting back and purchasing
4  this Laundromat?
5    A.  Absolutely not. I don't want anything to do
6  with Brendan Sherman and any of his businesses.
7    Q.  And that goes back to what you had mentioned
8  earlier?
9    A.  Yes, that he didn't represent himself as the
10  owner of the business, and I find that to be very
11  sketchy.
12    Q.  I am going to just recess for one minute.
13      (Recess taken.)
14      THE WITNESS:  I got the name of my
15  accountant, Dennis Snyder.
16  BY MR. MATLUSKY:
17    Q.  Dennis Snyder?
18    A.  Yes.
19    Q.  Do you know how you spell that?
20    A.  S-n-y-d-e-r.
21    Q.  And he is located in Greenville, you had
22  mentioned, somewhere?
23    A.  Yes.
24    Q.  Speaking of Mr. Snyder, did he have any input

Page 36

1  or direction after September 1st as to what you should do
2  to get out of the contract?
3    A.  Yes.  I took his advice to heart because I
4  feel like he is very smart, and everything he tells me, I
5  feel like it's right.  He told me to try to get out of it
6  any way possible, and since the inspection didn't occur
7  and that didn't work, to get out of that contract, and he
8  misrepresented himself.
9    Q.  As far as "he," you don't mean Dennis?
10    A.  Brendan Sherman, since he -- since he
11  misrepresented himself --
12    Q.  Dennis was aware about this representations
13  about who owned what?
14    A.  Yes.  And he said that it may not be anything
15  illegal that he did as far as misrepresenting himself as
16  the broker, not the owner, but just try to get out of it,
17  the contract.
18    Q.  Just to be clear, would you have tried to get
19  out of the contract or tried to declare it null and void
20  or void out the agreement of sale, the Asset Purchase
21  Agreement, in any way if, prior to September 1st,
22  everything was okay with the landlord giving the
23  assignment, but you still had the knowledge that Brendan
24  Sherman was somehow involved in the business, would you

Page 37

1  still have tried to get out of buying the business?
2    A.  Yes.  I would have contacted an attorney to
3  try to get out of it.  There was no way I was going to
4  buy that.
5    Q.  Did Brendan Sherman specifically tell you to
6  put in the September 2nd, 2005, letter, which is labeled
7  Defendant's Exhibit 2, language in there dealing with the
8  lease assignment?
9    A.  I copied that paragraph into the letter.
10    Q.  Was that at Brendan Sherman's direction or
11  input or insight?
12    A.  No.  But, like I said, the reason for the
13  inspection wasn't good enough, and I said, Well, you
14  didn't get the assignment of the lease, and that was the
15  other contingency, so that's what I am going to write
16  down.
17    Q.  So, the first time you wrote a letter to
18  Brendan Sherman trying to get out was involving the
19  contingency on September 1st?
20    A.  Yes.
21    Q.  Then you came back September 2nd and wrote
22  another letter?
23    A.  For the other contingency, yes.  If there
24  would have been a third one, I would have put that one

Roseann Sestito

11 (Pages 38 to 41)

**Page 38**

1  down, too.
2      Q.  If Mr. Sherman said that this September 2nd
3  letter wasn't good enough, at that point, what would you
4  have done?
5      A.  I would have contacted an attorney to get out
6  of the contract.
7      Q.  And you would have said to the attorney what?
8      A.  That he misrepresented himself to me as the
9  broker of the business and I didn't trust him to buy this
10  business from him.
11      Q.  So, just to be clear, up until what point did
12  you really not know of Brendan Sherman's true role in the
13  whole picture of you attempting to purchase this
14  Laundromat?
15      A.  I would say within five days of the
16  settlement --
17      Q.  And the settlement date --
18      A.  -- date.
19      Q.  And the settlement date, by way of
20  clarification?
21      A.  September 1st, 2005.
22      Q.  So, sometimes at the end of August?
23      A.  So the end of August, I spoke with
24  Dr. Abbesinio, who advised me who Mr. Sherman was.

**Page 39**

1      Q.  So, at that -- who initiated that particular
2  phone call?
3      A.  I did.
4      Q.  To -- you called Dr. Abbesinio?
5      A.  About the assignment of the lease.
6      Q.  And, at that point, you were just, more or
7  less, just questioning status or what was going on?
8      A.  Yes.  I wanted to know what was taking so
9  long, you know, what's the problem with the assigning the
10  lease over to me?  I was going to tell him that I had the
11  money for it and -- and then he dropped the ball and told
12  me that, so --
13      Q.  When you say, "He dropped the ball," that was
14  Dr. Abbesinio dropping the fact that he knew Brendan
15  Sherman was involved as the owner of the business of the
16  Laundromat?
17      A.  That's right.  Is that -- never mind.
18          MS. DIROCCO:  Go ahead.
19          (Discussion off the record.)
20          (The reporter read back as requested.)
21  BY MR. MATLUSKY:
22      Q.  By way of clarification, Brendan Sherman did
23  inform you that he would file a lawsuit against
24  Dr. Abbesinio prior to the date of -- he would file a

**Page 40**

1  lawsuit against Dr. Abbesinio?
2      A.  I don't remember if he actually used the term
3  "lawsuit."  He said he was in violation of the contract,
4  but I don't remember if he was going to sue him.  I don't
5  remember if he actually said that.
6      Q.  But he told you that prior to September 2nd,
7  2005, Brendan Sherman told you that?
8      A.  Yes.
9          MR. MATLUSKY:  That's it.
10          (The deposition was concluded at 10:18
11  a.m.)

          - - - - -

**Page 41**

1
2              INDEX TO TESTIMONY

3  ROSEANN A. SESTITO                    PAGE

   Examination by Mr. Matlusky           2
4
5              - - - - -
6
              INDEX TO EXHIBITS
7
                                         PAGE
8
9  Defendant's Deposition Exhibit No. 1 was    31
   marked for identification
10 Defendant's Deposition Exhibit No. 2 was    31
   marked for identification
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Corbett & Wilcox

Roseann Sestito

12 (Page 42)

Page 42

1            C E R T I F I C A T E
2    STATE OF DELAWARE:
                                :
3    NEW CASTLE COUNTY:
4         I, Renee A. Meyers, a Registered Professional
5    Reporter and Notary Public, within and for the County and
6    State aforesaid, do hereby certify that the foregoing
7    deposition of ROSEANN A. SESTITO, was taken before me,
8    pursuant to notice, at the time and place indicated; that
9    said deponent was by me duly sworn to tell the truth, the
10   whole truth, and nothing but the truth; that the
11   testimony of said deponent was correctly recorded in
12   machine shorthand by me and thereafter transcribed under
13   my supervision with computer-aided transcription; that
14   the deposition is a true record of the testimony given by
15   the witness; and that I am neither of counsel nor kin to
16   any party in said action, nor interested in the outcome
17   thereof.
18        WITNESS my hand this 31st day of May A.D. 2006.
19
20
     _____
21   RENEE A. MEYERS
     REGISTERED PROFESSIONAL REPORTER
     CERTIFICATION NO. 106-RPR
22   (Expires January 31, 2008)
23
24

Corbett & Wilcox